1   I-Che Lai
    Nevada Bar No. 012247
2   WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
    300 South 4th Street, 11th Floor
3   Las Vegas, NV  89101
    T: (702) 727-1400; F: (702) 727-1401
4   i-che.lai@wilsonelser.com

5   Michael A. Graziano (*pro hac vice*)
    ECKERT SEAMANS CHERIN & MELLOTT, LLC
6   1717 Pennsylvania Avenue, N.W., Suite 1200
    Washington, D.C.  20006
7   T: (202) 659-6671; F: (202) 659-6699
    mgraziano@eckertseamans.com

8
    *Attorneys for Defendant*
9   *Great American Insurance Company*

10                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
11

12  **SANDERINA LLC,** *et al.*,              Case No. 2:18-cv-00772-JAD-CWH

13                          Plaintiffs,        **DEFENDANT GREAT AMERICAN
                                               INSURANCE COMPANY'S MOTION FOR
    v.                                         SUMMARY JUDGMENT AND
14                                             MEMORANDUM OF POINTS AND
    **GREAT AMERICAN INSURANCE**               AUTHORITIES IN SUPPORT THEREOF
15  **COMPANY**, *et al.*,
                            Defendants.
16

17

18          Great American Insurance Company ("Great American") respectfully requests that the

19  Court enter summary judgment in its favor under Rule 56 of the Federal Rules of Civil

20  Procedure with respect to the three claims asserted in the complaint filed by plaintiffs Sanderina

21  LLC and Sanderina II, LLC (collectively "Sanderina"). As explained below, there are no genuine

22  disputes of material facts, and Great American is entitled to judgment as a matter of law.

                                              1

1303039v.1

**MEMORANDUM OF POINTS AND AUTHORITIES**

This case arises from a claim that Sanderina submitted under a commercial crime insurance policy issued by Great American. In a nutshell, an unknown third party impersonated Sanderina's majority owner, Victor Salerno, by sending emails from an account with a similar, but not identical, address to Salerno's legitimate account, and thereby duped Sanderina's Controller, Donna Atwood, to transfer funds to the imposter. (*See generally* Compl. [ECF No. 3-1].) Great American denied the claim because it is not covered under the policy. Sanderina sued, asserting claims for breach of contract, bad faith, and unfair claims practices. (*Id.*)

Great American deposed Sanderina's corporate representative under Rule 30(b)(6) of the Federal Rules of Civil Procedure on August 9, 2018. The deposition confirmed that there are no facts in dispute and, therefore, that this case can be resolved by summary judgment. Sanderina's breach of contract claim fails because the unambiguous language of the policy at issue precludes coverage for its loss. Sanderina seeks to recover under insuring agreements that cover forgery, computer fraud, and funds transfer fraud, but the U.S. Court of Appeals for the Ninth Circuit has already held that a scheme which is indistinguishable from the one at issue in this case in all material respects did not trigger coverage under similar insuring provisions. *Taylor & Lieberman v. Fed. Ins. Co.*, 681 F. App'x 627 (9th Cir. 2017).

Sanderina's remaining claims are, at best, frivolous. Great American's decision to deny the claim was prompt, and the basis for Great American's decision was more than reasonable. Moreover, Sanderina cannot point to any unfair claims practices committed by Great American.

2

**A.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

<u>The Scheme</u>

1.      Victor Salerno, as the majority owner of Sanderina, is authorized to approve the transfer of funds from Sanderina's accounts. (Sanderina II Dep., Ex. 1 at 6:25-7:3, 13:18-21.)

2.      When Salerno approves a transfer of funds, Donna Atwood, Sanderina's Controller, logs into Sanderina's online account with Bank of America and transmits the transfer request to the bank. (*Id*. at 10:9-10, 13:22-14:4.)

3.      The domain name that Sanderina uses for its legitimate email accounts is "usfantasy.com." (*Id*. at 16:8-10.)

4.      An unknown third party imposter created an email account with an address that is identical to Salerno's legitimate account except that the first "a" in the word "fantasy" was replaced with an "o"—*i.e.*, instead of "vic@usfantasy.com," the imposter used the email address "vic@usfontasy.com." (*Id*. at 16:1-7; *see also* Imposter Emails, Ex. 2.)

5.      The imposter sent several emails to Atwood from the "vic@usfontasy.com" account which asked Atwood to make six different funds transfers to the imposter's bank account. (Imposter Emails, Ex. 2.)

6.      Atwood, believing that the emails were from Salerno, submitted transfer requests to Bank of America. (Sanderina II Dep., Ex. 1 at 13:22-15:8; Payment Reports, Ex. 3.)

7.      Sanderina claims that Atwood authorized a total amount of $260,994.00 to be transferred, but that it was able to recover $82,234.79, for a total net loss of $178,759.21. (Proof of Loss, Ex. 4.)

3

Sanderina's Investigation

8.     Sanderina does not own the domain name from which the imposter's emails were sent, "usfontasy.com." (Sanderina II Dep., Ex. 1 at 16:1-7.)

9.     The domain name that Sanderina uses for its legitimate email accounts, "usfantasy.com," is owned by Michael Knapp, not by Sanderina. (Sanderina II Dep., Ex. 1 at 22:6-23:7.)

10.     After the loss occurred, Knapp contacted the company through which the legitimate domain name was registered, GoDaddy, to determine whether the imposter had accessed Sanderina's legitimate email accounts. (GoDaddy Emails, Ex. 5.)

11.     Godaddy "was insistent" that Sanderina's email accounts had not been accessed without authorization. (GoDaddy Emails, Ex. 5.)

12.     In addition, Sanderina hired an information technology consulting company called "NSA" to analyze whether any third parties had gained access to Sanderina's computer systems or email accounts. (Sanderina II Dep., Ex. 1 at 17:4-18:6.)

13.     The consultant was unable to identify any instances of a third party accessing Sanderina's computer systems or email accounts. (*Id.* at 18:22-19:5.)

14.     There is no evidence that a third party gained unauthorized access to Sanderina's computer systems or emails accounts. (*Id.* at 17:4-19:5, 29:13-30:22; GoDaddy Emails, Ex. 5.)

The Insurance Policy

15.     Great American issued commercial crime insurance policy number SAA E088077 00 00 to Sanderina LLC with a policy period of August 29, 2016, to August 29, 2017 ("the policy"). (Policy, Ex. 6.)

4

1303039v.1

16.    Insuring Agreement 2 of the policy provides as follows:

2.    Forgery or Alteration

a.    We will pay for loss resulting directly from forgery or alteration of checks, drafts, promissory notes, or similar written promises, orders, or directions to pay a sum certain in money that are:

(1)    made or drawn by or drawn upon you;

(2)    made or drawn by one acting as your agent;

or that purport to have been so made or drawn.

(*Id.* at § B.2.a.)

17.    The policy defines the term "Forgery" as follows:

Forgery means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(*Id.* at § C.7.)

18.    The policy includes a condition applicable specifically to Insuring Agreement 2 which provides as follows:

Facsimile Signatures

We will treat a reproduction of a handwritten signature the same as handwritten signatures. An electronic or digital signature is not treated as a reproduction of a handwritten signature.

(*Id.* at p. 19 of 20.)

19.    Insuring Agreement 5 of the policy provides as follows:

5.    Computer Fraud

5

> We will pay for loss resulting directly from the use of any computer to impersonate you, or your authorized officer or employee, to gain direct access to your computer system, or to the computer system of your financial institution, and thereby fraudulently cause the transfer of money, securities or other property from your premises or banking premises to a person, entity, place of account outside of your control.

(*Id.* at § B.5.)

20. Insuring Agreement 8 of the policy provides as follows:

> We will pay for loss of funds resulting directly from a fraudulent instruction directing a financial institution to transfer, pay or deliver funds from your transfer account.

> *         *         *

> As used in this Insuring Agreement:

> a.    Fraudulent instruction means:

>> (1)    A payment order transmitted to a financial institution which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent; or

>> (2)    A written instruction (other than those described in Insuring Agreement 2.) which purports to have been issued by you and which was sent or transmitted to a financial institution to establish the conditions under which transfers are to be initiated by such financial institution through an electronic funds transfer system and which was issued, forged or altered without your knowledge or consent.

(*Id.* at Endorsements (Form SE 00 41).)

## The Claim Investigation

21. Sanderina first notified Great American of a potential claim on Friday, April 21, 2017. (Notice Email, Ex. 7.)

6

22.     On the next business day, April 24, 2017, Great American acknowledged the claim and asked to schedule a call to discuss it with Sanderina. (Acknowledgement, Ex. 8.)

23.     Great American sent a letter to Sanderina on May 4, 2017, explaining why its loss likely was not covered based on the information Sanderina provided. (5/4/2017 Letter, Ex. 9.)

24.     On May 17, 2017, Sanderina informed Great American that it intended to submit a sworn proof of loss and pursue the claim despite Great American's explanation of why it likely was not covered. (5/17/2017 Email, Ex. 10.)

25.     Great American sent a blank proof of loss to Sanderina two days later, on May 19, 2017. (5/19/2017 Email, Ex. 11.)

26.     Sanderina sent a sworn proof of loss to Great American by mail on June 19, 2018. (6/28/2017 Email, Ex. 12.)

27.     Great American denied the claim on July 7, 2017. (7/7/2017 Letter, Ex. 13.)

## B.     ARGUMENT

### I.     SANDERINA'S BREACH OF CONTRACT CLAIM FAILS.

As the insured, Sanderina "has the burden to prove that the claim for which coverage is sought falls within the policy's insuring agreement." *Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, No. 206CV00911BESPAL, 2008 WL 11385601, at *6 (D. Nev. Apr. 24, 2008) (citation omitted). The Court must enforce the insurance policy "according to its terms to accomplish the intent of the parties." *CP Food & Beverage, Inc. v. U.S. Fire Ins. Co.*, 2:16-cv-02421, 2018 WL 3993408, at *3 (D. Nev. Aug. 6, 2018) (*citing Farmers Ins. Exch. v. Neal*, 64 P.3d 472, 473 (Nev. 2011)).

7

1    Sanderina contends that its loss is covered by Insuring Agreements 2, 5, and 8 of the

2  Great American policy. The clear and unambiguous language of those insuring agreements,

3  however, does not extend coverage to Sanderina's loss.

4              a.    The Claim Is Not Covered Under Insuring Agreement 2.

5      As previously explained, Insuring Agreement 2 provides as follows:

6          2.    Forgery or Alteration

7          a.    We will pay for loss resulting directly from forgery
                 or alteration of checks, drafts, promissory notes, or
8                similar written promises, orders, or directions to pay
                 a sum certain in money that are:
9
10              (1)    made or drawn by or drawn upon you;

11              (2)    made or drawn by one acting as your agent;

12          or that purport to have been so made or drawn.

13  (Policy, Ex. 6 at § B.2.a.)

14      Sanderina contends that the emails Atwood received from the imposter were "forged" or

15  "altered" documents, and, therefore, that Sanderina's loss is covered under Insuring Agreement 2

16  of the policy. Sanderina is wrong for at least two reasons.

17      First, the emails are not the type of financial instruments that are covered by Insuring

18  Agreement 2 because they are not "checks, drafts, promissory notes, or similar written promises,

19  orders, or directions to pay" that were, or purported to be, made, drawn by, or drawn upon

20  Sanderina or its agent. (*Id*.) Unlike the documents enumerated in Insuring Agreement 2, the

21  emails upon which Sanderina relies are not negotiable and do not permit the holder to demand

22  payment from a bank or a promisor. (Imposter Emails, Ex. 2.)

8

In *Taylor & Lieberman*, the insured sought coverage for a loss it sustained in connection with a fraud scheme that was identical in all material respects to the scheme at issue in this case. *Taylor & Lieberman v. Fed. Ins. Co.*, No. CV 14-3608 RSWL (SHx), 2015 WL 3824130, at *1 (C.D. Cal. June 18, 2015).[1] The insured received emails that appeared to be from a client, but were actually sent by an unknown imposter. *Id.* The emails asked the insured to transfer the client's funds to a bank account owned by the imposter. *Id.* Believing that the emails were sent by its client—just as Sanderina believed the emails at issue in this case were sent by its majority owner—the insured directed the bank to transfer the funds. *Id.*

The insured in *Taylor & Lieberman* argued that the emails sent by the imposter were covered under a forgery insuring provision that was identical to the one at issue in this case in all material respects. 681 F. App'x at 628 n.3 (noting that the documents covered by the forgery provision were defined by the policy as "'checks, drafts or similar written promises, orders or directions to pay a sum certain in money, that are made, drawn by or drawn upon' an insured, its agent, 'or that purported to have been so made or drawn'"). On appeal, the Ninth Circuit held that the insured's loss was not covered under the forgery provision because "the emails instructing [the insured] to wire money were not financial instruments, like checks, drafts, or the like." *Id.* at 628-29. For the same reason, the emails at issue in this case are not covered by Insuring Agreement 2 in the Great American policy.

Decisions by other federal courts throughout the country are in accord with the Ninth Circuit's holding in *Taylor & Lieberman*. *See*, *e.g.*, *Metro Brokers, Inc. v. Transp. Ins. Co.*, 603

---

[1]     The circumstances that gave rise to the loss at issue in *Taylor & Lieberman* are described in detail in the trial court's opinion, but not in the Ninth Circuit's opinion.

9

F. App'x 833, 835 (11th Cir. 2015) (electronic funds transfers were not covered); *Travelers Cas. & Sur. Co. of Am. v. Baptist Health Sys.*, 313 F.3d 295, 299 (5th Cir. 2002) (forged invoices were not covered); *Vons Cos. v. Fed. Ins. Co.*, 57 F. Supp. 2d 933, 945 (C.D. Cal. 1998), *aff'd*, 212 F.3d 489 (9th Cir. 2000) (recognizing that "the rationale behind making forgery a crime is the need of business to rely on negotiable instruments" and holding, therefore, that non-negotiable purchase orders, invoices, and wire requests were not covered).

The fact that Insuring Agreement 2 applies only to negotiable instruments is further confirmed by the policy's requirement that, in order to trigger coverage, a document must be, or purport to be, "made or drawn by or drawn upon" Sanderina or its agent. (Policy, Ex. 6 at 7 at § B.2.a.) As the Fifth Circuit noted in *Baptist Health*, the terms "maker" and "drawer" have specific meanings in the commercial paper context. 313 F.3d at 299. A "maker" is one signs a note as a person undertaking to pay and a "drawer" is one who signs a draft ordering a payment. *Id*. The same is true under Nevada law. Nev. Rev. Stat. §§ 104.3103(c)-(d) (defining a "drawer" as "a person who signs or is identified in a draft as a person ordering payment" and a "maker" as "a person who signs or is identified in a note as a person undertaking to pay"). The emails that Sanderina claims are covered were not "made" or "drawn" by or upon anybody as those terms are used in the commercial paper context.

The emails upon which Sanderina relies are not negotiable, would not permit the holder to demand payment from a bank or a promisor, and do not identify Sanderina—or anybody else—as a maker or a drawer. (Imposter Emails, Ex. 2.) Accordingly, the documents are not covered under Insuring Agreement 2.

10

Second, the emails were not "forge[d] or alter[ed]," as required to trigger coverage. (Policy, Ex. 6 at § B.2.) Since the e-mails were created, not altered, by the imposter, they would be covered only if they were forged. The policy defines "forgery" as follows:

> Forgery means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(*Id*. at § C.7.)

None of the emails are signed, and, therefore, none were forged. (Imposter Emails, Ex. 2.) Nevertheless, Sanderina contends that the electronically-typed moniker "Vic" constitutes a signature. The policy, however, explicitly states in Condition 2.b of the conditions listed as being "Applicable to Specific Insuring Agreements" that "[a]n electronic or digital signature is not treated as a reproduction of a handwritten signature." (Policy, Ex. 6 at p. 19 of 20.) Accordingly, the electronically-typed moniker "Vic" is not a signature and does not qualify as a forgery.

### b.   The Claim Is Not Covered Under Insuring Agreement 5.

Insuring Agreement 5 of the policy provides as follows:

> 5.   Computer Fraud

> We will pay for loss resulting directly from the use of any computer to impersonate you, or your authorized officer or employee, to gain direct access to your computer system, or to the computer system of your financial institution, and thereby fraudulently cause the transfer of money, securities or other property from your premises or banking premises to a person, entity, place of account outside of your control.

(Policy, Ex. 6 at § B.5.)

11

Sanderina's loss is not covered under Insuring Agreement 5 for two reasons. First and foremost, the imposter did not "gain direct access to [Sanderina's] computers system or to the computer system of [Sanderina's] financial institution." (*Id.*) Sanderina's own CEO and corporate designee under Rule 30(b)(6), Robert Kocienski, testified unequivocally that neither Sanderina nor a third party consultant that it hired found any evidence that the imposter accessed Sanderina's computers or email accounts:

> Q:  Do you know if the imposter ever logged into a computer system that was owned by Sanderina or accessed it in any way?
>
> A:  I don't know the answer to that. I think we looked at it and we didn't really see a breach, but that doesn't mean there wasn't a breach.
>
> Q:  Did Sanderina hire any consultants, IT consultants or anything like that to analyze its computer systems and determine whether or not they had been accessed by a third party?
>
> A:  Yeah. . . .
>
> Q:  Do you know what the result of the [consultant's] investigation was?
>
> A:  My understanding was that they did not find a breach.
>
>                  *            *            *
>
> Q:  What is the factual basis for the contention that a criminal hacked into Sanderina's computer system?
>
> A:  Well, I don't know specifically that a criminal hacked in. We did the research and they couldn't find a hack, but it doesn't mean it wasn't hacked into. . . . I do not know specifically that he hacked in or he just sent an e-mail from another. Okay. But it was important for us to point out that

12

there was a potential hack into the system. We just didn't
find it.

(Sanderina II Dep., Ex. 1 at 17:4-19:5, 29:13-30:22.) In addition, the company through which Sanderina's legitimate domain name was registered, GoDaddy, "was insistent" that Sanderina's email accounts had not been accessed without authorization. (GoDaddy Emails, Ex. 5.)

Kocienski speculated that there is a "possibility" that the imposter accessed a Sanderina computer. (Sanderina II Dep., Ex. 1 at 17:4-18, 30:2-22.) As Sanderina bears the burden of proving that its loss is covered, however, Kocienski's admission that neither Sanderina nor the experts it consulted could find any evidence of unauthorized access is dispositive. *See Vegas Constr. Co., Inc.*, 2008 WL 11385601, at *6.

In *Taylor & Lieberman*, the insured also argued that emails it received from an imposter were covered under a computer fraud insuring provision. 681 F. App'x at 629. The policy at issue in that case did not state that an imposter must gain direct access to the insured's computer to trigger coverage, but it did require that a third party gained "entry into" the insured's computer without authorization. *Id*. The Ninth Circuit held that the imposter's emails were not covered because the mere sending of an email does not constitute access to the computer that received the email. *Id*. (*citing Intel Corp. v. Hamidi*, 71 P.3d 296, 304 (Cal. 2003) (holding that the "mere sending" of emails does not amount to actionable trespass to a computer system in the absence of "some actual or threatened interference with the computers' functioning"); *Spam Arrest, LLC v. Replacements, Ltd.*, No. C12-481RAJ, 2013 WL 4675919, at *20 (W.D. Wash. Aug. 29, 2013) ("[N]o Ninth Circuit court has ever held that the mere act of sending an email constitutes access to a computer through which the email passes on the way to its recipient."));

13

1    *see also Kraft Chem. Co.*, *Inc. v. Fed. Ins. Co.*, No. 13 M2 002568, 2016 Ill. Cir. LEXIS 1, at

2    *10-23 (Ill. Cir. Ct. Jan. 5, 2016) ("[T]he mere sending of an email is not an unauthorized entry

3    or change therein to a computer system.") (citations omitted).

4         There is no material difference between the "direct access" requirement in the Great

5    American policy and the "entry into" requirement in the policy at issue in *Taylor & Lieberman*.

6    Accordingly, *Taylor & Lieberman* is directly on point, and Sanderina's claim is not covered.

7         Second, Sanderina's loss did not "result[] directly from" the emails since the emails did

8    not themselves "cause the transfer of money" to occur. (Policy, Ex. 6 at § B.5.) Instead, the

9    transfer requests Atwood later submitted to Bank of America caused the actual transfer of funds.

10   (Sanderina II Dep., Ex. 1 at 13:22-15:8; Payment Reports, Ex. 3.) Atwood's transfer requests

11   were intervening acts which rendered any causal connection between the imposter's emails and

12   Sanderina's loss indirect—as opposed to direct—because the transfers never would have

13   occurred but for Atwood's conduct. *See*, *e.g.*, *Apache Corp. v. Great Am. Ins. Co.*, 662 F. App'x

14   252, 258-59 (5th Cir. 2016); *Kraft Chem. Co.*, 2016 Ill. Cir. LEXIS 1, at *23-27; *Pestmaster

15   Servs. v. Travelers Cas. & Sur. Co. of Am.*, 656 F. App'x 332, 333 (9th Cir. 2016).

16        In *Pestmaster*, the Ninth Circuit observed that "reading [a computer fraud insuring]

17   provision to cover all transfers that involve both a computer and fraud at some point in the

18   transaction would convert [a] Crime Policy into a 'General Fraud' Policy" because "computers

19   are used in almost every business transaction[.]" *Id.* at 333. Citing *Pestmaster*, the Fifth Circuit

20   held in *Apache* that an insured's loss did not result "directly" from computer fraud when, as in

21   this case, an imposter used email to trick the insured into transferring funds. 662 F. App'x at

22   258-59. The court held that the loss was indirect because "the authorized transfer was made to

the fraudulent account only because, after receiving the email, [the insured] failed to investigate accurately the new, but fraudulent, information provided to it." *Id.*

As in *Pestmaster*, *Apache*, and *Kraft Chemical*, the transfers at issue in this case were authorized by the insured itself. Sanderina's own Controller, Atwood, submitted the transfer requests to Bank of America. (Sanderina II Dep., Ex. 1 at 13:22-15:8; Payment Reports, Ex. 3.) Since the transfers were authorized, they are not covered.[2]

In recent opinions, the U.S. Courts of Appeal for the Second and Sixth Circuits have rejected the argument that losses resulting from emails schemes similar to the one at issue in this case did not cause a direct loss for purposes of computer fraud coverage. *Medidata Sols. Inc. v. Fed. Ins. Co.*, 729 F. App'x 117, 119 (2d Cir. 2018); *Am. Tooling Ctr., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 895 F.3d 455, 463 (6th Cir. 2018). Those cases, however, are not persuasive.

*Medidata* is inapposite because the Second Circuit applied a minority rule that inappropriately equates the direct loss requirement in fidelity and crime insurance policies with the tort principle of proximate cause. 729 F. App'x at 119. This Court, however, recently held that Nevada would follow the majority "'direct means direct' rule" in construing fidelity and crime policies. *CP Food & Beverage, Inc.*, 2018 WL 3993408, at *2-4. Accordingly, the causation standard applied by the Second Circuit in *Medidata* does not apply in this case.

Under the "direct means direct" rule, a loss does not result directly from an occurrence unless it "follows straightaway, immediately, and without any intervention or interruption."

---

[2]      The Ninth Circuit's opinion in *Pestmaster* focuses on the phrase "'fraudulently cause a transfer[,]'" while the Fifth Circuit's opinion in *Apache* focuses on the direct-loss requirement. *Pestmaster*, 656 F. App'x at 333; *Apache*, 662 F. App'x at 258-59. Both courts, however, held that the computer fraud insuring provisions at issue did not apply to authorized transfers.

15

1   *Interactive Commc'ns Int'l, Inc. v. Great Am. Ins. Co.*, 731 F. App'x 929, 934 (11th Cir. 2018);

2   *see also Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 677 (6th Cir.

3   2012) (collecting cases). Applying that rule, courts have held that email imposter schemes

4   similar to the one at issue in this case were not covered because the insured's loss did not flow

5   immediately from the emails. *See*, *e.g.*, *Apache Corp.*, 662 F. App'x at 258-59; *Kraft Chem. Co.*,

6   2016 Ill. Cir. LEXIS 1, at *23-27.

7         In *American Tooling*, the Sixth Circuit applied the "direct means direct" rule and reached

8   the opposite result. 895 F.3d at 463. The court's application of the rule, however, does not make

9   sense. The court held that the emails caused the loss without any intervening step because, after

10   the insured received the emails, its employees "conducted a series of internal actions, all induced

11   by the fraudulent email, which led to the transfer of the money to the impersonator." *Id*. The

12   point that the court appears to have missed is that the "series of internal actions" <u>were</u>

13   intervening steps that rendered the causal connection between the emails and the loss indirect.

14   *See id*. The Fifth Circuit did not miss that point in *Apache*, and neither should this Court.

15                    <u>c.</u>    <u>The Claim Is Not Covered Under Insuring Agreement 8.</u>

16         Insuring Agreement 8 of the policy provides as follows:

17              We will pay for loss of funds resulting directly from a fraudulent
               instruction directing a financial institution to transfer, pay or deliver
18              funds from your transfer account.

19                              *                  *                  *

20         As used in this Insuring Agreement:

21              a.        Fraudulent instruction means:

22

16

(1)    A payment order transmitted to a financial institution which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent; or

(2)    A written instruction (other than those described in Insuring Agreement 2.) which purports to have been issued by you and which was sent or transmitted to a financial institution to establish the conditions under which transfers are to be initiated by such financial institution through an electronic funds transfer system and which was issued, forged or altered without your knowledge or consent.

(Policy, Ex. 6 at Endorsements (Form SE 00 41).)

Once again, Sanderina argues that the emails it received from an imposter give rise to coverage, and once again the Ninth Circuit's opinion in *Taylor & Lieberman* is directly on point. Like the Great American policy under which Sanderina has sued, the policy at issue in *Taylor & Lieberman* covered payment orders only if they were "'issued to a financial institution . . . without an Insured Organization's knowledge or consent.'" 681 F. App'x at 629. The Ninth Circuit held that emails the insured received from an imposter were not covered under that provision for two reasons, both of which apply equally in this case.

First, the emails at issue in *Taylor & Lieberman* did not trigger coverage because the insured was not a financial institution, and so the emails it received were not "'issued to a financial institution[.]'" *Id.* The same is true in this case. Sanderina is not a financial institution, and so the emails it received from the imposter were not "transmitted to a financial institution." (Policy, Ex. 6 at Endorsements (Form SE 00 41).) Accordingly, they are not covered.

Second, the Ninth Circuit held that the transfer instructions that the insured eventually sent to its client's bank were not covered because the insured "requested and knew about the

wire transfers." 681 F. App'x at 629. Again, the facts at issue in this case are identical. The transfer instructions upon which Sanderina's bank acted were transmitted by Sanderina's own Controller, Atwood, with Sanderina's knowledge and consent. (Sanderina II Dep., Ex. 1 at 13:22-15:8; Payment Reports, Ex. 3.) As in *Taylor & Lieberman*, "[a]lthough [Sanderina] did not know that the emailed instructions were fraudulent, it did know about the wire transfers." 681 F. App'x at 629. Accordingly, Sanderina's loss is not covered under Insuring Agreement 8.

## II.    SANDERINA'S BAD FAITH CLAIM FAILS.

Sanderina's complaint alleges that Great American breached the covenant of good faith and fair dealing by denying the insurance claim at issue "in the absence of a reasonable basis for denying such benefits under the insurance policy." (Compl. ¶ 28.) "To establish a claim for bad faith based on a denial of payment on all or part of a claim, a plaintiff must establish that (1) the insurer denied the claim, (2) the denial was unreasonable, and (3) the insurer knew it lacked a reasonable basis to deny the claim, or acted with reckless disregard as to the unreasonableness of the denial." *CP Food & Beverage, Inc.*, 2018 WL 3993408, at *4 (*citing Scumacher v. State Farm Fire & Cas. Co.*, 467 F. Supp. 2d 1090, 1095 (D. Nev. 2006); *Pemberton v. Farmers Ins. Exch.*, 858 P.2d 380, 382 (Nev. 1993)). "[I]f the insurer had a reasonable basis for its decision, there can be no finding of bad faith as a matter of law." *Id.* (*citing Sherwin v. Infinity Auto Ins. Co.*, No. 2:11-cv-00043-APG-GWF, 2013 WL 5918312, at *3 (D. Nev. Oct. 31, 2013), *aff'd*, 639 F. App'x 466 (9th Cir. 2016)).

Even assuming the Court finds that Sanderina's claim is covered, there can be no question that Great American's decision to deny coverage was at least reasonable. As demonstrated in this motion, Great American's position is supported by the plain language of the

18

1   policy and the Ninth Circuit's opinion in *Taylor & Lieberman*. Accordingly, Sanderina's bad

2   faith claim fails as a matter of law, and should be dismissed with prejudice.

3       **III.   SANDERINA'S UNFAIR CLAIMS PRACTICES CLAIM FAILS.**

4           Sanderina's complaint alleges that Great American violated several specific provisions of

5   Nevada's Unfair Claims Settlement Practices Act. (Compl. ¶¶ 33-40 (*citing* Nev. Rev. Stat. §

6   686.A310(1).) The complaint does not allege any specific facts which, if proven true, would

7   establish unfair claims practices. Instead, it relies on formulaic recitations of the statute. (*Id.*)

8           Great American attempted to discover the factual basis for Sandernia's conclusory

9   allegations through interrogatories and a Rule 30(b)(6) deposition. Sanderina's responses make it

10  clear that Sanderina's claim for unfair claims practices, like its bad faith claim, is predicated, and

11  completely dependent upon, the contention that Great American did not have a reasonable basis

12  for denying coverage. (*See* Pls.' Interrog. Answers, Ex. 14 at Interrogs. 3, 5-7; Sanderina II Dep.,

13  Ex. 1 at 32:22-33:25.) Indeed, Sanderina's corporate designee testified that every other issue

14  raised by the complaint is "minutia that other people deal with":

15      Q:    All right. If you'll turn to page 5 of the complaint and look
16                  at paragraph 34. It says, "Defendants misrepresented to plaintiffs pertinent facts or insurance policy provisions relating to the coverage at issue."
17

                Starting with the facts, which facts specifically—

18

19      A:    It was your response to the claim. Okay. When I read it, I says [*sic*] this is BS. Okay. It didn't address the issue, it went off in a different direction. So in my layman's opinion, you did not respond to the facts.
20

21      Q:    Well, were there facts that were specifically misstated in any of the communications that Great American made to Sanderina?
22

19

1

2        A:     Yeah. Your response that it was not a claim under the policy.

3        Q:     That it was not covered?

4        A:     And in my opinion, it was covered.

5        Q:     All right. Are there any other facts that were misstated by Great American?

6

        A:     The only fact that matters—

7

        MS. HAUF:    Objections. Calls for a legal conclusion. Beyond the

8                     scope.

9                     You can answer.

10       A:     The only fact that mattered to me was whether or not you felt the policy covered the claim. The rest of it is minutia

11               that other people deal with.

12  (Sanderina Dep., Ex. 1 at 32:22-33:25.)

13      The mere fact that Sanderina believes the claim is covered does not mean Great

14  American misrepresented any facts or policy language, failed to act promptly, made an

15  unreasonable coverage determination, or committed any other unfair claims practices. As

16  demonstrated above, Great American gave prompt and reasonable explanations for its decision

17  to deny the claim. Accordingly, Sanderina's claim for unfair claims practices fails as a matter of

18  law, and the Court should dismiss it with prejudice.

19

20

21

22

20

1   Dated this 4th day of September, 2018.

2                                       **ECKERT SEAMANS CHERIN & MELLOTT,**
3                                       **LLC**

4                                       /s/ Michael A. Graziano
5                                       Michael A. Graziano (*pro hac vice*)
                                        1717 Pennsylvania Avenue, N.W., Suite 1200
6                                       Washington, D.C.  20006
                                        T: (202) 659-6671
7                                       F: (202) 659-6699
                                        mgraziano@eckertseamans.com
8                                       *Co-counsel for Defendant Great American*
                                        *Insurance Company*
9
                                        **WILSON ELSER MOSKOWITZ EDELMAN &**
10                                      **DICKER LLP**

11                                      I-Che Lai
                                        Nevada Bar No. 012247
12                                      300 South 4th Street, 11th Floor
                                        Las Vegas, NV  89101
13                                      T: (702) 727-1400
                                        F: (702) 727-1401
14                                      i-che.lai@wilsonelser.com
                                        *Co-counsel for Defendant Great American*
15                                      *Insurance Company*

16

17

18

19

20

21

22

21

1

## **CERTIFICATE OF SERVICE**

2

        I hereby certify that on this 4th day of September 2018, a true and accurate copy of the

3

foregoing was served via the Court's electronic filing system on:

4

                Marjorie Hauf, Esq.
                Cara Xidis, Esq.

5

                Ganz & Hauf
                8950 W. Tropicana Ave., Suite 1

6

                Las Vegas, NV  89147

7

8

                                        /s/ Michael A. Graziano
                                        Michael A. Graziano

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1303039v.1